## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| VANESSA FORCELLI, | | Civil No. 20-699 (JRT/HB) |
| | Petitioner, | |
| v. | | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| TIMOTHY CHARLES SMITH, | | |
| | Respondent. | |

Kendal K. O'Keefe and Scott M. Rodman, **ARNOLD, RODMAN, & KRETCHMER** PLLC, 2626 East 82nd Street, Suite 355, Bloomington, MN 55122, for petitioner.

Allison Maxim, **MAXIM SMITH FAMILY LAW PLLC,** 333 Grand Avenue, Suite 201, Saint Paul, MN 55102, for respondent.

Petitioner, Vanessa Forcelli brings this action against Respondent, Timothy Charles Smith pursuant to the Hague Convention, 19 I.L.M. 1501 (1980) (the "Convention"), and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, alleging that Smith wrongfully retained their minor child, M.S.S., in the United States. Forcelli contends that the child is a habitual resident of Germany within the meaning of the Convention, and accordingly seeks an order from the Court directing the prompt return of the child to that country.

After carefully considering all testimony, exhibits, and arguments presented at the evidentiary hearing, taking into account the credibility and accuracy of the evidence, and examining the applicable law, the Court will find that the child's habitual residence is in

Germany, and that no exception or affirmative defense applies.  Accordingly, the Court will order that M.S.S. be returned to Germany.

## FINDINGS OF FACT[1]

1.      The Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2.      To the extent the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

## I.      THE PARTIES

3.      Forcelli, M.S.S.'s mother, is an Italian citizen born in Germany. She is a permanent resident of Germany and currently resides there. (Joint Stip. of Facts and Issues ("Stip.") ¶ 5, May 27, 2020, Docket No. 35.)

4.      Smith, M.S.S.'s father, is an American citizen, currently residing in Minnesota.  (*Id.* ¶ 6.)

5.      The parties were married in June 2005 in Las Vegas, Nevada, and moved to Germany sometime before 2008.  (*Id.* ¶¶ 10, 13.)

6.      The parties lived together with their children in Germany for the children's entire lives, until Smith moved to the United States in August 2018.  (*Id.* ¶ 13.)

---

[1] During the four-day evidentiary hearing, the parties presented evidence on myriad issues. The Court discusses only those facts relevant to determining the merits of Petitioner's claims.

7.      Forcelli and Smith are parents to three children, all born in Germany:

   a.  M.S.S., born February 5, 2008 (twelve years old).

   b.  J.O.S., born May 28, 2013 (seven years old)

   c.  M.J.S., born July 14, 2014, (six years old).  (*Id*. ¶ 3.)

8.      All of the children are German citizens; M.S.S. is also an American citizen, and the younger two children have applications for American citizenship pending.  (*Id*. ¶¶ 8, 11.)

9.      Both parents have "rights of custody" as to all three of their children. Currently, M.S.S. resides in Minnesota with her father; the two younger children currently reside in Germany with their mother.  (*Id.* ¶¶ 7-9.)

10.     The parties had a tumultuous relationship from at least 2016 onwards, and separated and reconciled several times.  Throughout their marriage, the parties had conversations about moving to the United States as a family.  (Tr. Vol. 2 at 235:22-236:12, July 13, 2020, Docket No. 63.)

11.     Forcelli began the German divorce or separation process in 2016, and a German court issued an order relating to custody in January 2018 requiring the parents to follow a "nest model" for the children, wherein the children lived at the family home and the parents took turns taking care of the children.  (Tr. Vol. 1, at 102:17-20; 103:6-22, July 13, 2020, Docket No. 62.)  However, the parents reconciled and the custody order was dismissed in April 2018.  (*Id.* at 103:23-104:1.)

-3-

12.     In fall 2018, Smith moved to the United States alone.  (*Id.* at 104:21-105:7.) Forcelli stayed in Germany with the three children.  Smith left substantial debts, both to private individuals and to the German tax authorities, and debt collectors regularly came to Forcelli's house.  (*Id.* at 105:25-109:20.)  Forcelli's accounts were temporarily frozen, and the financial issues continued throughout 2019.  (*Id.*)

13.     During that time, Smith's relationship with M.S.S. appears to have been rocky.  M.S.S. regularly blocked Smith from contacting her by phone, and when she communicated, she sent harsh and accusatory messages to Smith.  (Pet. Ex. 1 at 9, 12, 26, 30, 71, 75, 76; Tr. Vol. 1 at 117:7-118-7; Tr. Vol. 3 at 365:10-366:9, July 13, 2020, Docket No. 64.)

14.     In January 2019, Smith communicated to Forcelli that "[the kids] can fly [unaccompanied minor] (given that we live on two separate continents, this will be the [standard operating procedure] from now on). I want them to come here for as many of their school breaks as possible." (Pet. Ex. 1 at 1.)

15.     The parties' communication was sporadic in early 2019 and ceased for several months from roughly April to July 2019.  (Pet. Ex. 1 at 16-17.)

16.     Forcelli filed a new divorce action in Germany in June 2019.  (Stip. ¶ 15.)

## II.     VISIT TO MINNESOTA

17.     The parties began communications again in July 2019.  (Pet. Ex. 1 at 17.)  In July 2019, the parties agreed that Forcelli and the children would travel to Minnesota for

three weeks to visit Smith in August 2019. (Stip. ¶ 16.) Smith booked round trip tickets for Forcelli and the three children, arriving in Minneapolis on August 16, 2019, and departing for Germany on September 6, 2019. (Pet. Ex. 4; Tr. Vol. 1 at 129:21-130:4.)

18.    In the weeks preceding the trip, the parties discussed the possibility of Forcelli obtaining a green card so that if she chose to relocate to the United States, it would be easier for her to do so. (Tr. Vol. 2 at 243:5-244:17.) Forcelli brought the necessary documents, and the parties met with an immigration lawyer to discuss the process, as well as to begin the process of obtaining American citizenship for the two younger children. (*Id.*) Forcelli testified that she wanted to leave her options open, because she might want to move to the United States at some point. (Tr. Vol. 2 at 263:9-14.) Forcelli never completed the green card process. (Tr. Vol. 3 at 451:2-24.)

19.    In advance of the visit, Smith requested that Forcelli dismiss the German divorce proceedings entirely; Forcelli did not do so, but did stay the German divorce proceedings. (Stip. ¶ 17.)

20.    Prior to coming to Minnesota, and during her visit, Forcelli testified that she experienced health problems related to high blood pressure. (Tr. Vol. 1 at 132:18-133:10; 136:3-23.) She believed that these issues were related to stress caused by financial difficulties following Smith's move to the United States. (*Id.* at 132:18-134:9.) Once in the United States, Forcelli asked Smith to return to Germany with her and the children to resolve the financial issues. (*Id.*) Forcelli testified that Smith would not return to

Germany, but that he did agree to keep the children in Minnesota while Forcelli returned to Germany to take care of her health.  (*Id.* at 134:10-20.)

21.     Smith, on the other hand, testified that shortly after Forcelli and the children arrived in Minnesota, Forcelli said to him: "It's clear that the kids miss you and need you in their life," and that "I can see how happy [J.O.S.] is to have his dad and he needs his dad.  I have decided to go ahead and move here with the kids and get my green card so that we can co-parent and live here."  (Tr. Vol. 3 at 368:1-7.)  Smith testified that he and Forcelli agreed that she would move to the United States permanently with the children, which he refers to as "the plan." (Tr. Vol. 3 at 370:10-373:1.)

22.     On August 29, 2019, the parties jointly registered all three children for school in Rockford, Minnesota.  (Stip. ¶ 19.)  The parties jointly brought their children to their first day of school.  (*Id.* ¶ 20.)

### III.    FORCELLI RETURNS TO GERMANY

23.     Forcelli returned to Germany alone on September 6, 2019.  (Tr. Vol. 1 at 38:6-8).  That day, Forcelli texted a friend to explain that because of her health issues and ongoing stress, the kids were going to stay with Smith "in the USA for the time being" because "for the moment, this is the best solution."  (Pet. Ex. 7; Tr. Vol. 1 at 137:21-138:5.)

24.     Four days after her return to Germany, Forcelli was hospitalized for several days due to her high blood pressure, with concerns about a possible blood clot or thrombosis.  (Pet. Ex. 9.)  Doctors recommended additional tests for high blood pressure

and digestive issues.  (*Id.*)  Forcelli's health issues continued throughout September; Forcelli had another Emergency Room visit September 28, 2019, requiring treatment for high blood pressure.  (Pet. Ex. 1. at 175.)

25.    Shortly after she was released from the hospital, Forcelli texted another friend explaining that she and Smith had "decided for the children to be with him for the time being."  (Pet. Ex. 10.)  She explained that enrolling the children in school there and leaving them was difficult for her, "but for the time being that's the best."  (*Id*.)

26.    German law required Forcelli to notify the children's schools that they would not be attending.  (Tr. Vol. 1 at 145:10-24.)  Accordingly, Forcelli emailed M.S.S.'s teacher to say that "since summer vacation, [M.S.S.] and her two siblings have been in the USA and will be staying there for the time being.  They have already started school there and feel very much at home."  (Pet. Ex. 8.)

27.    German law also requires notice to the municipality for any permanent moves, and Smith deregistered when he moved to the United States.  (Tr. Vol. 1 at 105:8-22.)  However, Forcelli did not deregister the children from the city.  Instead, the municipality's notes reflect that on October 25, 2019, Forcelli visited the office and notified officials that the three children "are only staying temporarily with their father in America."  (Pet. Ex. 11.)  The notes go on to say that Forcelli "would like the children to live with her again" and that "[d]ue to the unresolved situation, the children will remain

registered in Weinstadt." The notes conclude that Forcelli will inform the municipality "as soon as the stay in America becomes permanent." (*Id.*)

28.    From Germany, Forcelli kept in regular contact with all three children through Smith and directly to M.S.S.'s phone. (Tr. Vol. 1 at 156:4-7.)

29.    Throughout their conversations, Smith speaks constantly about his hopes and plans for Forcelli to return to the United States, for them to reconcile, and for the family to live together in the United States. Forcelli does not ever respond or indicate a similar understanding. (*See generally,* Pet. Ex. 1.) Smith also consistently discusses "the plan," and whether Forcelli is "flip-flopping" on the plan. (*See generally, id.*) Smith testified that Forcelli never discusses in her texts that "the plan" is temporary. (Tr. Vol. 3 at 373:3-5.) However, Forcelli does not appear to respond to *any* conversations about "the plan" or Smith's repeated accusations of "flip-flopping." (*See generally* Pet. Ex. 1.)

30.    Forcelli testified that she tried to ignore these overtures because she was afraid Smith would overreact if she turned him down or denied him, so instead she focused on the kids, the financial issues in Germany, and her health. (Tr. Vol. 1 at 159:1-10.) In late September, however, Forcelli testified that she explained to Smith that they were not going to reconcile. (*Id.* at 159:11-15.) At that point, Forcelli testified that Smith became distant and her communication with the children decreased. (*Id.* at 159:19-21.)

31.    The parties' messages became rancorous around this time, and it appears Forcelli became concerned about Smith retaining the children. On September 10, 2019,

she texted "You fucking Monster[.] I will get the kids[.] You will not ever ever teach them to do what you did." (Pet. Ex. 1 at 112.)  Shortly afterward, she explained that "I am on it and I will also get the kids," and that "My kids will always love me even if you take them away from me!" (*Id.*)  Smith replied that "The kids need stability.  They have that here for now."  Forcelli texted that, "I will get the kids[.] . . .  No matter what you try[.]  Try to steel [*sic*] them." (*Id.* at 115.)

32.     On September 24, 2019 Forcelli again told Smith, "I never thought you are capable of this shit but you are[.]  So try to take my Kids from me[.]   It will never happen[.] . . . Do not attempt to steel [*sic*] the kids. (*Id.* at 159.)  Smith responded that "I will now focus on stabilizing my life as much as possible to support the kids here in the best possible way.  At least they will get the best possible dad I can be – they deserve that, as well." (*Id.*)  Forcelli replied, "There?  So you think they are staying there?" (*Id.*)  Smith responded, "I live here for now with no plans to leave.  So this is where I have to provide them with the best possible chance for now.  I live here for now.  And the kids live with me for now.  As such I will do what I can." (*Id.* at 160.)

33.     On October 14, 2020, Forcelli wrote that "I am getting my Kids[.]  Watch me." (*Id.* at 211.)  Smith replies that "[T]hey are OUR kids Vanessa.  Not just yours." (*Id.*)  Forcelli replied, "I will get them" and that "[i]f there is not the money that you are supposed to put in there I will book the next flight and get the kids[.]" (*Id.*)  She also wrote

that "I will come to get my Kids[.]  You don't own anyone[.]  You don't get to keep my children[.]"  (*Id.* at 213.)

34.     Forcelli testified that by mid-October 2019, she was having trouble communicating with M.S.S. and that M.S.S. was very moody.  (Tr. Vol. 1 at 156:8-17.)  Forcelli testified that she was worried that Smith was preventing contact with the children.  (*Id.* at 157:23-158:7.)  Smith testified that the children were unwilling to speak to Forcelli.  (Tr. Vol. 3 at 385:15-386:8.)

*35.*     On November 17, 2019, after the parties had another fight, Smith emailed Forcelli  and said that he needed to do "what is in the best interests of the kids" and that he believed that "it is in there [*sic*] best interests to stay her [*sic*] in Minnesota with me." (Pet. Ex. 12.)  He wrote that Forcelli could "go ahead and call the police and take whatever action [she believed she] must take" because he was going to do whatever he had to "to get them the peace, stability and routine they need and deserve."  (*Id.*)  He also told Forcelli to never to come to his home or property, and that he would "inform the local police abut these issues accordingly."  (*Id.*)

*36.*     Forcelli understood this email to mean that Smith intended to keep the children in the United States for good.  (Tr. Vol. 1 at 152:5-16.)  She called the police in Minnesota, as well as the German consulate.  (*Id.* at 161:9-25.)

37.     After Smith announced his decision to keep the children in the United States, Forcelli testified that Smith generally filtered their conversations through his new girlfriend.  (*Id.* at 160:20-161:8.)

38.     In December 2019, Forcelli travelled to Minnesota without Smith's advance knowledge, intending to return with all three children to Germany.  (Stip. ¶ 22.)  She testified that she was "very desperate" and did not know what else to do.  (Tr. Vol. 1 at 167:5-12.)  Forcelli picked the children up at school, ostensibly to go to lunch, but M.S.S. refused to leave with her.  (Tr. Vol. 3 at 401:10 – 406:7.)  Forcelli later returned to Germany with the younger two children, leaving M.S.S. in Minnesota.  (Stip. ¶ 22.)

39.      Forcelli then re-activated the German divorce proceeding in January 2020. (Stip. ¶ 23.)

## IV.    M.S.S.'S RELATIONSHIP WITH HER PARENTS

40.     Initially, M.S.S. appears to have struggled with the changes of living in Minnesota.  Forcelli asked in September 2019, "Will M.S.S. make some friends?  She seems sad[.]  Depressed?"  (Pet. Ex. 1 at 119.)  Smith replied, "I hope she makes a friend or two soon[.] . . . We just need her to get some confidence and not always think negative thoughts."  (*Id.*)

41.     A few days later, Smith wrote that he contacted potential therapists for the children, to get them "transitional therapy (given [M.S.S.'s] prior ADD diagnosis, the stress they have and are under, and their behavioral changes.)"  (*Id.* at 138.)  By mid-November,

Smith had found a therapist for M.S.S., because she still "needs help coping with all she's been through over the years and her current situation." (*Id.* at 257.)

42.     M.S.S.'s therapist has diagnosed her as having "an adjustment disorder[2] with mixed mood." (Tr. Vol. 1 at 71:8-11.) He described her as a developmentally normal twelve-year-old, with normal social abilities. (*Id.* at 71:12-72:2.)

43.     The therapist testified that M.S.S. told him that Forcelli had once slapped M.S.S. when she told Forcelli that she was attracted to a girl. (*Id.* at 73:24-74:8.) Smith also testified that Forcelli is homophobic. (Tr. Vol. 3 at 383:4-17.) Forcelli denied the incident, denied any homophobia, and explained that M.S.S. did not come out as a lesbian until she was in Minnesota. (Tr. Vol. 2 at 202:12-203:20.) Forcelli also noted that while she was shocked when she learned M.S.S., then eleven years old, had a girlfriend, her shock stemmed from the fact that an eleven-year-old had a significant other at all. (*Id.* at 204:4-205:11.)

44.     The therapist also testified that M.S.S. had told him that she was afraid of Forcelli and that Forcelli was emotionally abusive, and that M.S.S. had concerns about Forcelli's mental health. (Tr. Vol. 1 at 74: 9-17; 77:20-22.) Smith also testified that Forcelli had threatened suicide in November 2019, (Tr. Vol. 3 at 394:11-395:12), and had

---

[2] The Mayo Clinic explains that an adjustment disorder is a "stress-related condition[]" in which the person experiences "more stress than would normally be expected in response to a stressful or unexpected event, and the stress causes significant problems" in "relationships, at work, or at school." *See* Adjustment Disorders, https://www.mayoclinic.org/diseases-conditions/adjustment-disorders/symptoms-causes/syc-20355224.

previously suffered from depression and other mental health issues (*Id.* at 396:13-398:22.)

45.    As an example of Forcelli's abusive behavior, Smith testified that in November 2019, M.S.S. wanted to cut her hair short; Forcelli initially objected, but later relented. (Tr. Vol. 3 at 380:23-381:16.) M.S.S. liked the short haircut, but Forcelli did not, and Forcelli described it to Smith as "a fucking nightmare." (Pet. Ex. 1 at 280.)

46.    In the time since Forcelli returned to Germany with the two younger children, M.S.S. and Smith moved in with Smith's new girlfriend and Smith moved M.S.S. to a new school, without informing Forcelli of either move. (Tr. Vol. 2 at 208:18-209:12.) Forcelli testified that Smith requires that M.S.S. speak to Forcelli only in the presence of Smith's girlfriend, and only in English because Smith's girlfriend does not speak German. (*Id.* at 211:8-25.) Forcelli testified that at various points, she was aware that Smith's girlfriend was recording M.S.S.'s calls with Forcelli. (*Id.* at 215: 2-19.) Smith's girlfriend admitted to recording a call between Forcelli and M.S.S, but explained that it was because Forcelli and M.S.S. would scream at each other. (Tr. Vol. 3 at 472:6-25.) Forcelli also testified that M.S.S. began echoing Smith's general accusations against Forcelli – that the difficulties between the parents were Forcelli's fault and that Smith had only been doing his best. (Tr. Vol. 2 at 213:8-214:20.)

47.    M.S.S.'s adjustment to her new school had ups and downs. She reported to the Court that she has friends in Minnesota, and has maintained her friendships in

Germany.  Academically, she did well in several subjects, but received low or failing grades in Math and Technology.  (Tr. Vol. 3 at 427:3-428:20.)  However, because of the sudden shift to distance learning as a result of COVID-19, among other reasons, the low or failing grades were converted to a "pass" and were not counted in M.S.S.'s GPA.  (*Id.* at 427:11-23.)

48.     The Court interviewed M.S.S. and found her to be bright, articulate, and mature for a twelve-year-old.  She spoke forthrightly and was clear in her preference to remain in the United States with her father.

49.     M.S.S. said that her real relationship was with her father and not her mother.  She also explained that she would get into trouble with Forcelli if she received poor grades at school.  M.S.S. also reported to the Court that Forcelli once purposefully dug her fingernails into M.S.S.'s skin when grabbing her hand or arm.

50.     M.S.S. generally referred to Forcelli with disdain.  Although she explained to the Court that she was not involved in the Court proceeding, she also echoed her father's testimony verbatim more than once, including accusing her mother of "flip-flopping" instead of making decisions, and of "kidnapping" her siblings.

## V.     PROCEDURAL HISTORY

51.     The parties filed competing Petitions in this District regarding M.S.S. (Forcelli Petition, March 9, 2020, Docket No. 1; Smith Answer and Counter Petition, April

13, Docket No. 17.)[3]  The Court held a four-day evidentiary hearing on the matter on June 10, 12, 16, and 19, with all testimony and exhibits done by Zoom to accommodate the Covid-19 pandemic as well as international witnesses.  (Docket Nos. 51, 52, 56, 59.)  The Court also interviewed M.S.S. alone in chambers on June 23, 2020, with counsel for the parties listening, but not viewing, by Zoom.

## CONCLUSIONS OF LAW

1.  "The Hague Conference on Private International Law adopted the Hague Convention in 1980 to address the problem of international child abductions during domestic disputes."  *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (cleaned up).  The Hague Convention seeks "to deter parents from crossing international boundaries in search of a more sympathetic court."  *Silverman v. Silverman*, 388 F.3d 886, 889 (8th Cir. 2003) (en banc) (citing *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995)).

---

[3] Smith initially filed a Hague Petition (among other custody-related filings) in Minnesota State Court in January 2020, which was dismissed for lack of jurisdiction.  *See In Re the Custody of MSS, JOS, MJS*, No. 10-FA-20-14 (Minn. Dist. Ct.).  After Forcelli filed her Petition in this District, Smith filed a Petition in Germany seeking the return of the two younger children.  (Stip. ¶ 24.)  The German court held a hearing on Smith's petition for the return of the two younger children in May 2020, and declined to order their return, finding that Germany was their habitual residence. (Pet. Ex. 23, 24; Pet. Letter to the Court  at 14, June 8, 2020, Docket No. 47.)  Smith is appealing this order, in part because Smith was unable to appear in person or by videoconference for the hearing.  (Tr. Vol. 3 at 422:25-423:23.)

**VI.    HABITUAL RESIDENCE**

2.      "The Hague Convention entitles a person whose child has wrongfully been removed to or retained in the United States to secure the prompt return of the child to the child's country of habitual residence, unless the respondent can establish that an affirmative defense applies."  *Custodio v. Samillan*, 842 F.3d 1084, 1087 (8th Cir. 2016) (citing *Rydder*, 49 F.3d at 372).  This is so because "[i]t is the Convention's core premise that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence."  *Monasky*, 140 S. Ct. 719, 723 (2020) (cleaned up).  Accordingly, it is not the duty or province of the Court to determine custodial matters, but instead merely to determine which country's courts have that duty.

3.      Courts determine the habitual residence of a child based on the totality of the circumstances.  *Monasky*, 140 S. Ct. 719, 723 (2020). "The Hague Convention does not define the term 'habitual residence'" but a "child 'resides' where she lives."  *Id.* at 726. That residence becomes habitual "when her residence there is more than transitory," when it is where "the family and social environment in which the child's life has developed," and when there is "some degree of integration by the child in a social and family environment."  *Id.* (cleaned up).  At the same time, "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence."  *Id.* at 727.  In acquiring a

new habitual residence, one must also have a settled intention to abandon one's prior habitual residence. *See, e.g., Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001).

4. As the petitioner, Forcelli bears the burden of proving by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A).

5. M.S.S. was born in Germany, and lived her entire life in Germany.  When M.S.S. arrived in Minnesota with her mother and siblings in August 2019, both she and her parents understood that they were taking a three-week trip to visit Smith.  There can be no real question that until this point, M.S.S.'s habitual residence was Germany.

6. Once in Minnesota, the parties determined that the children should not return on the previously scheduled date, but that instead they should remain in Minnesota for the time being, while Forcelli went back to Germany to take care of her health and work on the parties lingering financial issues.

7. At trial, Smith indicated that Forcelli's health issues were unserious or otherwise not the true cause of her return to Germany.  However, within days of her return, she was hospitalized for high blood pressure and potential thrombosis.  She had at least one more trip to the emergency room for the same condition not long afterwards.

8. The parties did jointly enroll the three children in school in Minnesota, and Forcelli temporarily de-enrolled them from school in Germany.  However, she did not

notify the municipal authorities that the children had permanently moved, as would have been required for a permanent move.

9.      Throughout the fall of 2019, Forcelli did express interest in obtaining a green card; however, it is unclear to the Court that Forcelli equated this status with actually moving to the United States or living there permanently.  It is also unclear to the Court how seriously Forcelli considered the issue at all; her interest waxes and wanes and does not appear a priority.

10.      The Court finds that M.S.S.'s habitual residence did not shift from Germany to the United States during the months she has lived in Minnesota.  Although Smith insists that, within a few days of arriving, Forcelli made a binding agreement to move the family to the United States permanently, thus shifting M.S.S.'s habitual residence, the Court cannot find an intention to abandon the prior habitual residence of Germany.  In his post-trial briefing, Smith also suggests that M.S.S.'s habitual residence shifted to the United States in November 2019; presumably this date references Smith's email to Forcelli announcing that he intended to keep the children.  However, Smith's views of M.S.S.'s best interests are not determinative of her habitual residence.

11.      Accordingly, the Court finds that Germany is M.S.S.'s habitual residence.

## II.   AFFIRMATIVE DEFENSES

12.      Finding that M.S.S.'s habitual residence is Germany, and that Smith wrongly retained her in the United States, Article 12 of the Convention provides that she must be

returned to Germany unless certain defenses apply, in which case return is discretionary. *Smedley v. Smedley*, 772 F.3d 184, 186–87 (4th Cir. 2014) (citing Hague Convention arts. 12, 13).  Smith argues that (1) that Forcelli consented to M.S.S.'s relocation; (2) M.S.S.'s return to Germany would pose a "grave risk" of physical or psychological harm; and (3) M.S.S. objects to return and is old and mature enough to make it appropriate to take account of the child's views.  *See id*.

## A.  Consent

13.     The consent defense provides that "the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . the person, institution or other body having care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention[.]"  Hague Convention, art. 13(a).  However, "[t]he fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) (collecting cases).  The consent inquiry focuses on the petitioner's subjective intent.  *Id.*

14.     Smith bears the burden of proving by a preponderance of the evidence that the removal or retention was wrongful under Article 3.  22 U.S.C. § 9003 (e)(2)(B).

15.     Smith concedes that Forcelli and the children initially came to Minnesota for a planned three-week vacation.  However, he argues that he and Forcelli determined,

during the three-week period when the family was together in Minnesota, that she and the children would leave Germany permanently and relocate to the United States, and that she would return to Germany temporarily to settle their affairs before moving to Minnesota.  Thus, in Smith's view, Forcelli consented to M.S.S.'s permanent relocation in the United States, and the Court should decline to order M.S.S. returned.

16.     Although it is certainly true that the children did not return to Germany with Forcelli at what was to be the end of their three-week trip and that the parties jointly enrolled them in Minnesota public schools, Forcelli's actions lead to the Court to conclude that Forcelli intended the move to be temporary and did not consent to M.S.S.'s permanent relocation to the United States.  As discussed, once in Germany, Forcelli temporarily de-enrolled the children from their German schools, as required by law, but she did not de-register the children from the municipal authorities' register, as would also be required by law if the children had permanently moved.  Smith, for example, de-registered himself weeks before actually leaving the country.

17.     Furthermore, throughout the parties' communication, Forcelli expresses concern that Smith might attempt to keep the children.  When Forcelli learned with certainty that Smith did intend to keep the children in the United States, she flew to Minnesota without telling Smith with the intent to bring all three children back to Germany.

18.     Accordingly, the Court finds that Smith has not demonstrated by a preponderance of the evidence that Forcelli consented to M.S.S.'s permanent move to the United States.

**B. Grave Risk of Harm**

19.     The Convention also notes that "a child's return is not in order if the return would place her at a 'grave risk' of harm or otherwise in 'an intolerable situation.'" *Monasky*, 140 S. Ct. at 723.  The Eighth Circuit has recognized "two types of grave risk that are cognizable under Article 13(b): cases in which a child is sent to a zone of war, famine, or disease and those involving serious abuse or neglect." *Vasquez v. Colores*, 648 F.3d 648, 650 (8th Cir. 2011).  Here, only the latter is at issue.  Grave risk of harm is to be interpreted narrowly.  *See, e.g., Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996). "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Acosta v. Acosta*, 725 F.3d 868, 876 (8th Cir. 2013).

20.     However, the determination "does not include an adjudication of the underlying custody dispute," and "[i]t is not relevant to this Convention exception who is the better parent in the long run."  *Vasquez*, 648 F.3d at 650 (quoting *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995)).  Nor is it an opportunity for the Court to "consider evidence relevant to custody or the best interests of the child."  *Nunez-Escudero*, 58 F.3d at 378.

21.     Smith bears the burden of proving by clear and convincing the evidence that M.S.S. will face a grave risk of harm if she returns to Germany.  22 U.S.C. § 9003(e)(2)(A).

22.     Smith argues that returning M.S.S. to Germany would place her at grave risk of harm because Forcelli is abusive and homophobic.

23.     As to abuse, Smith points to M.S.S.'s conversations with her therapist, wherein M.S.S. reported that Forcelli had slapped M.S.S. because M.S.S told her about having a crush on another girl.  M.S.S. also reported to the Court that Forcelli had dug her fingernails into M.S.S.'s skin.  Smith also notes that Forcelli disliked M.S.S.'s short haircut.

24.     The Court is not in a position to evaluate the parties' parenting, and will not do so here.  As discussed elsewhere, a Hague proceeding is not the place for custody decisions.  Here, Smith has not presented clear and convincing evidence that M.S.S. will be at grave risk of harm.  Smith has not demonstrated serious abuse or neglect, even if Forcelli's actions were inappropriate.  Instead, he essentially argued that it was in M.S.S.'s best interests to remain with him in the United States because he is the better parent. However, the Court may not consider M.S.S.'s best interests in this analysis.

25.     Accordingly, the Court finds that the "grave risk of harm" exception does not apply.

## C.  Age and Degree of Maturity

26.     Finally, the convention provides an affirmative defense of a child's wishes based on the child's age and maturity.  "An analysis of whether to apply the 'wishes of

the child' exception requires consideration of the goals of the Convention and a determination of whether the child is of sufficient age and maturity for his or her views to be taken into account." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007). The Convention does not set a minimum age for sufficient maturity, and courts have varied in their determinations. *Id.* Courts also consider whether a child's view is "the product of undue influence, in which case the 'child's wishes' should not be considered." *Id.*

27.     Furthermore, a child's "generalized desire" to remain in the United States is "not necessarily sufficient to invoke the exception." *Id.* Instead, the Child must "include particularized objections to returning to" the former country of residence. *Id.* Similarly, a child's "preference for one parent over another is insufficient. Considering such a preference would place the Court in the position of deciding parental custody, which is prohibited by the Hague Convention and ICARA." *Vite-Cruz v. Sanchez*, 360 F. Supp. 3d 346, 360 (D.S.C. 2018). Indeed, "[g]iving consideration to such wishes would place the court in the position of deciding custody which is explicitly not the mandate of a court hearing a wrongful retention case under the Hague Convention." *Id.*

28.     Additionally, even if a child is "settled in their new environment" the Court must consider that a wrongfully withholding or abducting parent "must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted." *Silverman*, 338 F.3d at 901.

-23-

29.     Smith argues that M.S.S., at twelve years old, has reached sufficient age and maturity that her views should be taken into account.

30.     The Court interviewed M.S.S. alone in chambers, with counsel for the parents listening to, but not participating in, the conversation.  The Court found M.S.S. to be bright, articulate, and mature for a twelve-year-old.  M.S.S. clearly explained her preference was to remain in Minnesota, and that she did not want to go to Germany.  She spoke in harsh terms about her mother, and in glowing terms about her father.

31.     While the Court cannot conclude that M.S.S. was coached, the particular idiomatic use of language and similar arguments calls into question whether M.S.S.'s preference to remain in the United States is her own, or whether it has been cemented by others.  *See Watts v. Watts*, No. 2:17-CV-1309-RJS, 2018 WL 10808728, at *16 (D. Utah Feb. 7, 2018), *aff'd*, 935 F.3d 1138 (10th Cir. 2019).  Furthermore, the circumstances of the last seven months – considering that M.S.S. was distraught after Forcelli returned to Germany with the two younger children, that she lived exclusively with Smith, and that there has been somewhat limited communication between Forcelli and M.S.S. –  do not help alleviate that concern.

32.     The Court also notes that M.S.S. appeared to have displayed a similar negative attitude towards her father during the period when Smith lived alone in the United States and M.S.S. was with her mother and siblings in Germany.  During that

period, M.S.S. was cold, harsh, and distant from Smith; now that the geographic and familial situations are reversed, she has a similar affect towards Forcelli.

33.     Accordingly, the Court finds that M.S.S. is mature, and has taken her views into consideration.  The Court is sympathetic to her wishes to stay in the United States, and recognizes that returning to Germany may be very difficult.   However, the circumstances do not warrant providing her view controlling weight.  Even if the Court were of the view that it was clearly in M.S.S.'s best interests to remain in the United States, the Court would nonetheless conclude that it must order her returned to Germany, because her best interests are a question of custody, not habitual residence. Custody must be determined by a German court, not this Court.

**ORDER FOR JUDGMENT**

Based on the Court's Findings of Fact and Conclusions of Law, **IT IS HEREBY ORDERED AND DECLARED** that:

1.  Judgment be entered for Petitioner and against Respondent.

2.  Respondent shall coordinate with Petitioner to facilitate M.S.S.'s return to Germany within twenty-one days of the date of this Order.

3.  Upon application to the Court, reasonable attorney's fees and costs will be awarded to Petitioner's counsel.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 25, 2020
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court